# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MEGAN HOOKEY, | ) |
| Plaintiff, | ) Civil Action No. 08 - 1733 |
| | ) |
| | ) District Judge Joy Flowers Conti |
| v. | ) Chief Magistrate Judge Lisa Pupo Lenihan |
| | ) |
| JOSEPH PELZER, *Warden*, CHERYL | ) |
| MCGAVITT, *Head Nurse*, EDWARD | ) ECF No. 103 |
| STRAWN, *Captain*, WASHINGTON | ) |
| COUNTY, JOHN C. PETTIT, and | ) |
| LISA SUTHERLAND, *Adult* | ) |
| *Probation Officer*, | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

For the reasons that follow, it is respectfully recommended that the Motion for Summary Judgment filed by Defendants Pelzer, McGavitt, Strawn and Washington County (ECF No. 103) be granted.  It is further recommended that Defendant Sutherland be dismissed from this action for Plaintiff's failure to timely serve her in compliance with Federal Rule of Civil Procedure 4(m) and for Plaintiff's failure to prosecute under Federal Rule of Civil Procedure 4(b).  It is also recommended that Defendant Pettit be dismissed from this action because he is deceased and Plaintiff failed to file a proper motion to substitute naming his legal representative within the required time pursuant to Federal Rule of Civil Procedure 25(a)(1).

## II. __REPORT__

Plaintiff, Megan Hookey, a former inmate at the Washington County Jail ("WCJ") in Washington County, Pennsylvania, commenced this action on December 22, 2008 pursuant to 42 U.S.C. § 1983. She filed an Amended Complaint on June 28, 2010 (ECF No. 37) alleging violations of her constitutional rights against Defendants Joseph Pelzer, Warden of the WCJ; Cheryl McGavitt, Heard Nurse at the WCJ; Edward Strawn, Captain at the WCJ; Washington County; John C. Pettit, former District Attorney for Washington County; Michael Fagella, Assistant District Attorney for Washington County; Lisa Sutherland, Washington County Adult Probation Officer; Brian Gorman, Public Defender in the Washington County Public Defenders' Office; and the Honorable Paul M. Pozonsky, Judge of the Court of Common Pleas of Washington County.

Defendants Gorman, Pozonsky and Fagella moved to dismiss the Amended Complaint and by Order of Court dated February 24, 2011, their motions were granted and Plaintiff's claims against them were dismissed. (ECF No. 66.) In the undersigned's previous Report recommending dismissal of those claims, which was adopted by the Court, it was noted that Defendant John C. Pettit, the former District Attorney of Washington County, had passed away on October 30, 2010. (ECF No. 64 at n.1.) He was never served with Plaintiff's complaint prior to his death, and although Plaintiff filed a motion to substitute, she did not name the proper legal representative as the substitute party and her motion was therefore denied. (ECF No. 71.) Defendants Pelzer, McGavitt, Strawn and Washington County filed a Motion for Summary Judgment, which was later denied without prejudice to refile after pro bono counsel was appointed for Plaintiff. Following lengthy discovery, Defendants refiled their Motion for Summary Judgment on November 1, 2012. (ECF No. 103.) Along with their Motion, they also

2

filed a Brief in Support thereof (ECF No. 104) and a Concise Statement of Material Facts (ECF No. 105). In response, Plaintiff submitted a brief in opposition to summary judgment (ECF No. 107) along with supporting exhibits (ECF No. 108). Defendants' Motion is now ripe for review.

## A.  Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted.

Anderson, 477 U.S. at 249-50.   Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form.   *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## B.  Factual Background[1]

On January 6, 2007, Plaintiff was arrested and booked into the Washington County Jail (hereinafter referred to as "WCJ").   (Affidavit of Cheryl McGavitt, ECF No. 103-1 at ¶ 5.)   At the time of intake, she was intoxicated and indicated that she was not pregnant because she was currently on her menstrual period and had just delivered a baby approximately two and a half months earlier.   Id.   However, previous jail records indicated that pregnancy tests performed on July 14, 2006 and August 18, 2006 were negative.   Id.   Plaintiff was housed on the general female housing unit from January 6, 2007 until her release on May 21, 2007.   Id. at ¶ 6.   She claims that during this time she was involved in sexual relations with County officials including guards and District Attorney John Pettit.   (Brief in Opposition to Summary Judgment, ECF No. 107 at 2.)   Also during this time, she was seen by medical staff on numerous occasions for complaints most notably related to urinary tract pain.   (ECF No. 103-1 at ¶ 7.)   According to Defendant McGavitt, Plaintiff often refused testing and treatment for her medical complaints and was disrespectful towards staff.   Id.   She maintains that Plaintiff did not, however, complain at

---

[1] Under the Local Rules of Court for the Western District of Pennsylvania, material facts set forth in a moving party's statement of facts will be deemed admitted for the purpose of deciding a motion for summary judgment "unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."   *See* L.R. 56.1(E). Courts in this district strictly apply Local Rule 56 and deem uncontroverted facts to be admitted.   *See* Emigh v. Miller, No. 08-1726, 2010 U.S. Dist. LEXIS 74414, 2010 WL 2926213 (W.D. Pa. July 23, 2010) (collecting cases). Although Plaintiff submitted a brief in opposition to summary judgment which contains attached exhibits, she failed to file a "counter" statement of material facts.   Therefore, Defendants' statement of facts as set forth in ECF No. 105 will be admitted as true and correct, unless otherwise specified herein.

any time about sexual relations or assaults that were allegedly occurring during the time of her confinement.  Id. at ¶ 8.

As noted above, Plaintiff was released from custody on parole on May 21, 2007.  Id. at ¶7.  She maintains that she was released per Defendant Judge Pozonsky's orders and into the custody of District Attorney Pettit but without release authority.  (ECF No. 107 at 3.)  She was later readmitted into the WCJ on October 17, 2007, after being arrested for assault.  (ECF No. 103-1 at ¶ 10.)  At that time, she claimed to be pregnant.  Id.  Upon admission, Plaintiff stated that she her last menstrual period was June 13, 2007.  Id.  September 23, 2007 medical records from her Obstetrician, Dr. Geoffrey Connolly, and a sonogram result done at Magee Women's Hospital on November 13, 2007, similarly indicated that her last menstrual period was June 13, 2007, which would have been after her previous release from the WCJ on May 21, 2007.  Id. at ¶ 11.  The November 13, 2007, sonogram placed the pregnancy at that time at 21.9 weeks, meaning conception had occurred on or about June 15-18, 2007.  Id.

On October 18, 2007, the day after she was admitted into the WCJ, Plaintiff reported being "kicked in the stomach several times" the night before by her step-father and "not feeling the baby move since yesterday."  Id. at ¶ 12.  She was transported to the emergency room and returned with a prescription for an antibiotic.  Id.  She was also instructed to follow up with the Obstetrician on October 29, 2007.  Id.  The appointment was rescheduled for October 26, 2007, to which she was taken.  Id.  The next follow-up appointment was scheduled for November 9, 2007.  Id.  Plaintiff was evaluated by the facility psychiatrist on October 23, 2007, and diagnosed with "Delusional Disorder vs. Personality Disorder vs. Factitious Disorder" and possibility having an impairment "in her reality testing."  Id. at ¶ 13.  She was released from the WCJ on November 5, 2007, after the charges against her were dropped.  Id. at ¶ 14.

Plaintiff was readmitted in the WCJ on November 16, 2007, to serve a sentence for a probation violation following her release on November 5, 2007. Id. at ¶ 15. She stated that she had not followed up with her doctor while she was out of the WCJ. Id. While Defendant McGavitt declares to have made Plaintiff an obstetrician appointment for November 28, 2007, it is unclear whether or not she was actually taken to it. Id. at 16. According to Defendant McGavitt, Plaintiff was moved from the general female housing unit into processing for disciplinary purposes after she became loud and disrespectful to the nursing staff when attempting to administer Plaintiff her pre-natal vitamins on November 22, 2007. Id. at ¶ 17. She allegedly fell in her cell on November 26, 2007, and complained of pain to her right buttocks and down her right leg posteriorly. Id. at ¶ 18. After the fall, she was offered Tylenol and sent to the Washington Hospital ER for evaluation where a sonogram revealed normal findings. Id. She returned with a prescription for antibiotics and was moved to the clinic cell for close observation. Id.

Also on November 26, 2007, Defendant McGavitt received a call from Defendant Sutherland, Plaintiff's probation officer, expressing her concern that Plaintiff may try to intentionally harm her fetus. Id. at ¶ 19. Defendant Sutherland forwarded a copy of court documents presented to Defendant Judge Pozonsky on November 19, 2007, citing repeated fictitious statements Plaintiff had made regarding the number of children she has and that she had been falsifying pregnancies since the age of 13. Id. The probation office recommended that Plaintiff be sent to Muncy Women's State Prison until the time of delivery so that she could receive adequate mental health and prenatal care, indicating that her mental illness of a personality type disorder would explain Plaintiff's behaviors. Id. Following these recommendations, Plaintiff was maintained in the clinic area for close observation for the safety

of her and her fetus.  Id. at 20.  She was housed there in a private, single cell from November 26, 2007 until her transfer to SCI-Muncy on January 23, 2008, a period of 57 days.  Id.

According to Defendant McGavitt, Plaintiff was taken to follow-up visits with her Obstetrician on November 28, 2007; December 21, 2007; January 4, 2008; and January 18, 2008. Id. at ¶¶ 21-24.  McGavitt declares that the doctors and staff never expressed any concerns over Plaintiff's medical or personal hygienic state and all their orders were followed.  Id. at ¶ 25.  On her November 28, 2007 visit, cultures were performed and lab work was ordered.  Id. at ¶ 21. Plaintiff returned with a prescription which was provided to her.  Id.  On her December 21, 2007 visit, Plaintiff was referred to labor and delivery and met with a social worker to discuss her feelings.  Id. at ¶ 22.  She had lab work and exams done and was cleared to return to the jail.  Id. On her January 4, 2008 visit, she returned with prescriptions which were provided to her.  Id. at ¶ 23.  Finally, on her January 18, 2008 visit, she also returned with prescriptions and a clearance slip for her transport to SCI-Muncy via car.  Id. at ¶ 24.  On January 23, 2008, she was transported from WCJ to the control of state corrections officials.  Id. at ¶ 26.  Plaintiff gave birth to a son on March 12, 2008.  (ECF No. 107 at 3.)

At the request of the Family Court Center of Washington County, Pennsylvania, genetic testing was done and paternity of Plaintiff's child was established at a 99.99% certainty to be that of Plaintiff's boyfriend, Aaron Jones.  (ECF No. 103-2 at 3-7.)

## C. Discussion

### 1. Access to Courts Claim

Plaintiff claims that she was denied her First Amendment right under the United States Constitution to access the courts.  Specifically, she claims that during her confinement in the

WCJ clinic from November 26, 2007, through January 23, 2008,[2] she had restricted movement and was only permitted out of her cell to occasionally shower and for medical purposes. During this time she claims that she was denied access to the law library, and, as a result, was denied access to the courts.

Under the First Amendment, prisoners have a right of access to the courts. *See* Lewis v. Casey, 518 U.S. 343 (1996). However, in Lewis, the Supreme Court held that an "actual injury" is a "constitutional prerequisite" for access to the courts claims. Id. at 351. An actual injury is shown only where a nonfrivolous claim, or one of arguable merit, is lost. *See* Christopher v. Harbury, 536 U.S. 403, 415 (2003); *see also* Monroe v. Beard, 536 F.3d 198, 205 (3d Cir. 2008). The Third Circuit has explained that a plaintiff must specifically state in his complaint the underlying claim with the requirements of Federal Rule of Civil Procedure 8 to the same degree as if the underlying claim was being pursued independently. Christopher, 536 U.S. at 417. In this regard, the statement must be sufficiently specific to ensure that the district court can ascertain that the claim is not frivolous and that the "'arguable' nature of the underlying claim is more than hope." Id. at 416.

Plaintiff's First Amendment access to courts claim is a bald statement that she was denied access to the law library and was only allowed to ask a jail employee legal questions to which he did not know the answers. She avers no allegations and provides no facts showing that the alleged denial of access to a law library caused any actual injury in her pursuit of a non-frivolous legal claim or any claim at all for that matter. Accordingly, Defendants should be granted summary judgment with respect to this claim.

---

[2] During this time period, Plaintiff was confined in the WCJ serving a sentence for a probation violation. *See* ECF No. 107 at 3. Therefore, she was not a pretrial detainee but rather a sentenced inmate.

## 2. Retaliation and Due Process Claims

Plaintiff's retaliation and due process claims are interrelated.[3]  She claims that she was held under close medical observation in the WCJ clinic for two months, November 26, 2007 to January 23, 2008, in retaliation for her accusations against Defendants and other jail staff and in violation of her due process rights.

With respect to Plaintiff's retaliation claim, it is well settled that retaliation for the exercise of a constitutionally protected activity is itself a violation of rights secured by the Constitution, which is actionable under section 1983.  Rauser v. Horn, 341 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990).  However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) that the conduct in which he engaged was constitutionally protected; (2) that he suffered "adverse action" at the hands of prison officials;[4] and (3) that his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct.  Rauser, 241 F.3d at 333 (adopting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  Once Plaintiff has made his *prima facia* case, the burden shifts to Defendants to prove by a preponderance of the evidence that he or she "would have made the same decision absent the

_____

[3] The undersigned notes that Plaintiff's *pro se* Amended Complaint did not contain the instant retaliation or due process claims, and, because of this, Defendants have not addressed such claims in their Motion for Summary Judgment.  However, appointed counsel for Plaintiff has raised such claims for the first time in her brief in opposition to summary judgment.  It is well established that courts do not consider claims raised for the first time in such a procedural manner.  *See* Hang On, Inc. v. City of Arlington, 65 F.3d. 1248, 1255 (5th Cir. 1995) (affirming district court's decision to not address claims raised for the first time in response to a motion for summary judgment); *see also* Gueson v. Feldman, No. 00-cv-1117, 2002 U.S. Dist. LEXIS 16265, 2002 WL 32308678, at *4 (E.D. Pa. Aug. 22, 2002) (same in response to a motion to dismiss).  Nevertheless, to the extent these claims can be liberally construed from Plaintiff's *pro se* Amended Complaint, the undersigned will address them on their merits.

[4] With respect to the second factor, an adverse action is one "sufficient to deter a person of ordinary firmness from exercising his rights."  Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

protected conduct for reasons reasonably related to penological interest." Rauser, 241 F.3d at 334 (incorporating Turner v. Safley, 482 U.S. 78, 89 (1987)).

Plaintiff maintains that her confinement in the WCJ clinic was motivated by the jail's desire to keep her from further pursuing action against it. She states that the jail was aware of her accusations and in support of her averment she cites to the deposition of Defendant McGavitt. However, Defendant McGavitt's deposition testimony does not support Plaintiff's position that she was being held in the clinic in retaliation for her accusations but instead suggests quite the contrary – that Defendant McGavitt thought it prudent for the jail to move or transfer Plaintiff because of the "escalations" of her accusations. (McGavitt Deposition, ECF No. 103-1 at 9.) Nevertheless, to the extent Plaintiff's unspecified general accusations qualify as protected activity,[5] her retaliation claim still fails on its merits because she has not demonstrated, and the evidence does not support an inference, that her accusations were a substantial motivating factor for why she was housed in the WCJ clinic for two months. Instead, the record, including Plaintiff's exhibits, clearly demonstrate that she was initially confined in the clinic under close medical observation after she injured herself from an alleged fall in her cell on November 26, 2007 (ECF No. 108-3 at 33), and she remained housed in the clinic under observation after Defendant McGavitt received a phone call that same day from Plaintiff's probation officer, Defendant Sutherland, stating her concerns that Plaintiff may try to harm her

---

[5] Although Plaintiff does not specify the accusations to which she refers to in her brief, the undersigned notes that Plaintiff did attach an inmate grievance dated December 5, 2007, wherein she states that she was being housed in the clinic "out of spite" because of a lawsuit she had filed against the jail naming Defendant McGavitt. (ECF No. 108-1 at 1.) The instant lawsuit was not initiated until December 2008, a year after that grievance was filed and the undersigned has been unable to locate any other civil suit, at least in federal court, which Plaintiff may have filed during the time she was initially placed in the clinic under observation. If, however, Plaintiff is maintaining that she was retaliated against because of legal action taken against the jail or Defendants, then she has satisfied the first element of a retaliation claim by engaging in protected activity. See Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997); Millhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981).

fetus (ECF No. 103-1 at 7). There is simply nothing in the record that creates a question of fact as to whether Plaintiff was being confined in the clinic in retaliation for anything. Indeed, Plaintiff even acknowledges that Defendant McGavitt thought that it was best to move or transfer her from the facility and apparently requested such action in a note to Deputy Warden Temas. (ECF No. 103-1 at 9; ECF No. 107 at 5.) Therefore, it would appear that Plaintiff's averments are contradictory. Moreover, assuming the existence of a pending lawsuit against the WCJ and Defendant McGavitt at the time of Plaintiff's confinement in late 2007, the record demonstrates that Defendants would have housed Plaintiff within the clinic under close observation despite such legal action to protect Plaintiff's health and safety of her unborn child. Therefore, to the extent Plaintiff raises such a retaliation claim in her Amended Complaint, Defendants should be granted summary judgment on such claim.

Plaintiff also claims that she was held for two months in the clinic in violation of her due process rights. She maintains that she did not know why she was being held in the clinic but was told in response to her grievance that she was being held for a pending misconduct. However, she claims that there were no incident reports around that period of time and at no time was she informed of what the charges were against her and given an opportunity to respond. She further avers that Defendant McGavitt herself was unable to clearly articulate why Plaintiff was housed in the clinic, and if for mental health reasons, she contends that there is no evidence to support the justification for such restriction.[6]

"The core of due process is the right to notice and a meaningful opportunity to be heard." LaChance v. Erickson, 522 U.S. 262, 266 (1998). In analyzing any procedural due process claim

---

[6] While the clinic in the WCJ is generally used as a place for close medical observation, it is also used to house female inmates for disciplinary purposes since there is no female solitary confinement unit at the jail. (ECF No. 107 at 4.)

of this type, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing Fuentes v. Shevin, 407 U.S. 67 (1972)). Once it is determined that a property or liberty interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it. Id. (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

The threshold question presented by Plaintiff's claim is whether Defendants' actions impacted a constitutionally protected liberty interest. Normally, transfer from one level of custody in a prison to another does not impinge a constitutionally protected interest. Wilkinson v. Austin, 545 U.S. 209 (2005) (no liberty interest "in avoiding transfer to more adverse conditions of confinement"); Hewitt v. Helms, 459 U.S. 460, 468 (1983) (finding that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence"); Meachum v. Fano, 427 U.S. 215, 224 (1976) (holding that there is no liberty interest invoked "when a prisoner is transferred to the institution with the more severe rules."). Moreover, the Due Process Clause does not create an inherent liberty interest to remain free from administrative segregation. *See*, *e.g.*, Hewitt, 459 U.S. at 468; Wolff v. McDonnell, 418 U.S. 539, 556 (1974); Montayne v. Haymes, 427 U.S. 236, 242 (1976); Sheehan v. Beyer, 51 F.3d 1170, 1175 (3d Cir. 1995); Layton v. Beyer, 953 F.2d 839, 845 (3d Cir. 1992). However, the Supreme Court has held that prison conditions deprive a prisoner of a state created liberty interest that is protected by due process guarantees when they result in "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 483 (1995). The baseline for determining what is "atypical and significant hardship…in relation to the

ordinary incidents of prison life" is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law. Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997). In finding that the prisoner's thirty-day confinement in disciplinary custody did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest, the Sandin Court considered the following two factors: 1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement. Shoats, 213 F.3d at 143-44 (citations omitted, emphasis added).

Notwithstanding the apparent factual dispute as to why Plaintiff was being held under close observation in the WCJ clinic from November 26, 2007 until January 23, 2008,[7] the case law clearly supports the conclusion that Plaintiff's two month confinement in the clinic did not impose an atypical and significant hardship in relation to the ordinary incidents of prison life and thus did not implicate a liberty interest which would trigger due process protections under the Fourteenth Amendment. *See* Griffin v. Vaughn, 112 F.3d 703 (3d Cir. 1997) (inmate placed in administrative segregation for 15 months without hearing deprived of no interest protected by Due Process Clause); Smith v. Mensinger, 293 F.3d 641, 653-54 (3d Cir. 2002) (seven months in disciplinary confinement did not implicate liberty interest); Jones v. Baker, 155 F.3d 810, 813

---

[7] While Plaintiff complains that she was advised in response to her grievance that her confinement in the clinic was due to a pending misconduct, the undersigned notes that she was also advised in response to that same grievance that she was in the clinic for medical observation for which she had not been cleared. (ECF No. 108-1 at 1.) Plaintiff also complains that, according to Defendant McGavitt, she was confined in the clinic for mental health reasons but that her mental health evaluations prior to entering the clinic indicated that all seemed normal and it wasn't until January 8, 2008, that it was recommended that Plaintiff be kept under constant supervision. However, the record indicates, and Plaintiff has not disputed, that she was initially brought to the clinic for observation after suffering a fall in her cell on November 26, 2007, and remained in the clinic out of safety concerns for her fetus at the request of her probation officer that same day.

(6th Cir. 1998) (confinement in administrative segregation for two and one-half years is not atypical), cited with approval in Fraise v. Terhune, 283 F.3d 506, 523 (3d Cir. 2002). *Compare* Shoats, 213 F.3d at 144 (eight years in administrative custody triggers liberty interest and requires regular review hearings to satisfy due process); Brown v. Department of Corrections, 2007 U.S. Dist. LEXIS 97227, 2007 WL 4322980 (W.D. Pa. 2007) (assuming three and one-half years in administrative segregation triggers a due process interest in a hearing), *affirmed on other grounds*, 265 F. App'x 107 (3d Cir. 2008). For this reason, Defendants should be granted summary judgment on Plaintiff's due process claim.

### 3. Sixth Amendment Claim

Plaintiff alleges that she was denied her rights under the Sixth Amendment to the United States Constitution. The Sixth Amendment states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

U.S. Const. amend. VI.

Plaintiff alleges no facts in her Amended Complaint that would implicate the Sixth Amendment with respect to her claims against the remaining Defendants and her appointed counsel does not argue for or against Defendants' request for summary judgment as to any such Sixth Amendment claim.[8] However, to the extent Plaintiff is pursuing such claim, the undersigned recommends granting summary judgment in favor of Defendants.

---

[8] In any event, a civil rights action under § 1983 is not the proper vehicle by which to bring such a claim.

### 4. Deliberate Indifference to Health and Safety Claims[9]

Plaintiff claims that Defendants were deliberately indifferent to her health and safety in violation of the Eighth Amendment to the United States Constitution. In this regard, Plaintiff must demonstrate that she (1) was incarcerated under conditions which posed a substantial risk of harm; and (2) that prison officials acted with "deliberate indifference" to her health and safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). "Deliberate indifference" in this context is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (quoting Beers-Capital v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001)). A plaintiff can prove an official's actual knowledge of a substantial risk to his safety 'in the usual ways, including inference from circumstantial evidence.'" Id. (quoting Farmer, 511 U.S. at 842). However, a plaintiff must show "more than [an] ordinary lack of due care for the prisoners' interests or safety." Farmer, 511 U.S. at 835.

Plaintiff's first deliberate indifference claim is twofold. She claims that Defendant McGavitt was deliberately indifferent to her health and safety by failing to recognize that her symptoms of urinary tract pain and frequent episodes of urinary tract infections (UTI) and pelvic inflammatory disease (PID) were caused by sexual promiscuity between Plaintiff and the guards, other inmates, County employees or District Attorney ("DA") Pettit. Assuming Defendant

---

[9] The undersigned notes none of the Eighth Amendment deliberate indifference claims addressed herein were specifically alleged in Plaintiff's *pro se* Amended Complaint. Instead, Plaintiff claimed that Defendants Pelzer, Strawn, and McGavitt were deliberately indifferent to her health by refusing to provide her with adequate medical care. The following Eighth Amendment claims of deliberate indifference were raised for the first time in counsel's response in opposition to summary judgment and counsel does not address Plaintiff's *pro se* deliberate indifference to medical needs claim. As previously stated, claims cannot be raised for the first time in a response to summary judgment. *See*, *supra*, FN3. However, out of an abundance of caution the undersigned will address appointed counsel's deliberate indifference claims raised in her response as well as Plaintiff's claim regarding deliberate indifference to medical needs.

McGavitt was aware that her symptoms were caused by such sexual misconduct, Plaintiff maintains that Defendant was deliberately indifferent by failing to report the misconduct to her superiors, and, as a result failed to protect her from harm. Upon review of the record, the undersigned concludes that Plaintiff has failed to show that Defendant McGavitt was actually aware of any sexual misconduct between Plaintiff and the DA or any County employee or fellow inmate. Apart from her unfounded assumption that apparently all UTI and PID symptoms are caused by sexual promiscuity, and, therefore, Plaintiff must have been the victim of sexual misconduct at the time of her confinement in order to have presented with such symptoms, Plaintiff has failed to submit any evidence whatsoever which would suggest that Defendant McGavitt knew of the alleged sexual misconduct, knew that Plaintiff's symptoms were caused by the sexual misconduct or knew of and disregarded an excessive risk to Plaintiff's health and safety in this regard by failing to report it to her superiors. According to Defendant McGavitt, Plaintiff never informed her of any inappropriate sexual relations and this averment must be deemed admitted because Plaintiff failed to submit a counter statement of material facts in response to Defendants' motion for summary judgment. *See*, *supra*, FN 1. Accordingly, Plaintiff has failed to demonstrate a question of fact as to whether Defendant McGavitt was deliberately indifferent to her health and safety in the manner in which she claims and Defendant McGavitt should be granted summary judgment for this reason.

Plaintiff's second deliberate indifference claim is that Defendant McGavitt failed to secure Plaintiff mental health counseling until January 2008 even though she was aware that Plaintiff's mental health may have been a reason for her observation and cell restriction in the clinic starting on November 26, 2007. Once again, it appears that Plaintiff's averments are contradictory. With respect to her due process claim, Plaintiff maintained that there was no

evidence to support her confinement in the clinic for mental health reasons, yet now she maintains that the evidence supports a finding that she was in the clinic in part due to her mental health and that Defendant McGavitt should have secured her mental health counseling at an earlier date. Nevertheless, there appears to be no dispute that Defendant McGavitt knew of Plaintiff's mental health status at least at the time of her initial confinement in the clinic due in part to her phone conversation with Plaintiff's probation officer, Defendant Sutherland, who indicated that Plaintiff's mental illness could explain her behaviors and recommended that Plaintiff be sent to SCI-Muncy until the time of her delivery so that she could receive appropriate mental health and pre-natal care. The question, therefore, becomes whether Defendant McGavitt was aware that failing to request that Plaintiff be provided with mental health counseling upon her initial confinement in the clinic posed a substantial risk of harm to Plaintiff's health and safety.

Assuming Plaintiff's mental health issues qualify as a serious medical need, *see* Estelle v. Gamble, 429 U.S. 97, 106 (1976), Plaintiff has failed to demonstrate that Defendant McGavitt was deliberately indifferent to her needs because there is nothing in the record to suggest that Defendant consciously disregarded an excessive risk to Plaintiff's mental health and safety. *See* Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (Deliberate indifference requires "obduracy and wantonness . . . [,] which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.") (citations omitted). The record indicates that Plaintiff was moved to the clinic to be under close observation solely to protect her and her fetus because of her apparent mental health issues. Plaintiff received consistent mental health evaluations both before and after her confinement in the clinic. *See* ECF No. 208-1 at 1-42. While some of the exams indicate that Plaintiff had a personality disorder, delusional disorder, or bipolar disorder,

there were a number of evaluations where Plaintiff was diagnosed as normal, including Plaintiff's mental health exam just over one week before being placed in the clinic. See ECF No. 108-1 at 26-38. Moreover, Plaintiff's court ordered psychologist, Anne Cross, advised to Defendant Sutherland on January 8, 2008, that Plaintiff should be kept under constant supervision based on her April 2007 evaluation of Plaintiff evidencing bipolar disorder and out of fear that Plaintiff may harm herself. *See* ECF Nos. 108-1 at 9-12, 39-40. At this time, however, Plaintiff was already being kept under constant supervision in the clinic based, in part, on the recommendation of Defendant Sutherland. Thus, it appears from the record that Defendant McGavitt followed these suggestions out of consideration of Plaintiff's wellbeing and there is no evidence in the record indicating deliberate indifference on her part.

The final Eighth Amendment claim raised in response to summary judgment is against Defendants Pelzer, Warden of the WCJ, and Strawn, Captain at the WCJ. Upon review, it is clear that Plaintiff attempts to assert liability against both Defendants in their supervisory capacities. In this regard, a supervisory defendant can be held liable if he or she played an "affirmative part" in the complained-of misconduct. *See* Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986) (citing Rizzo v. Goode, 423 U.S. 362, 377 (1976)). The Third Circuit Court of Appeals has stated that "a supervisor may be personally liable . . . if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (footnote omitted). Additionally, "[i]t is possible to establish section 1983 supervisory liability by showing a supervisor tolerated past or ongoing misbehavior." Baker v. Monroe Township, 50 F.3d 1186, 1191 n.3 (3d Cir. 1995) (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 724-25 (3d Cir. 1989)). Further, "a

supervisor may be liable under § 1983 if he or she implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct." Argueta v. United States Immigration & Customs Enforcement, 643 F.3d 60, 72 (3d Cir. 2011) (citing Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001).

Here, Plaintiff argues that Defendants Pelzer and Strawn were deliberately indifferent to her health and safety because they were both aware that Defendant District Attorney Pettit was being investigated by the FBI at the time of Plaintiff's confinement but implemented a practice of releasing female inmates to his control without the proper paperwork and releasing authority, ultimately subjecting her and other female inmates to sexual abuse at his command. She also maintains that they were aware of her allegations of sexual misconduct but failed to investigate her claims.

First, Plaintiff has put forth no record evidence that she was the victim of sexual assault by DA Pettit, any other county employee or fellow inmate. She has not submitted a sworn statement attesting to such allegations and her amended complaint was not verified. *See* Ziegler v. Eby, 77 F. App'x 117, 120 (3d Cir. 2003) ("[T]he complaint was not verified, thereby precluding the District Court from treating it as the equivalent of an affidavit for purposes of Federal Rule of Civil Procedure 56(e)."); Reese v. Sparks, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit on summary judgment motion). Nevertheless, Plaintiff has produced no evidence to suggest that these Defendants had actual knowledge or reason to believe that she was the victim of sexual abuse. Although there is one note in Plaintiff's medical records dated July 14, 2006, that indicates Plaintiff made "allegations" and that such allegations were conveyed to Deputy Warden Temas (ECF No. 108-3 at 5), there is no

indication, and Plaintiff does not specify, as to what these allegations were. Moreover, there is no indication that these two Defendants, or anyone at the WCJ for that matter, were aware of her specific accusations of sexual misconduct. Thus, Plaintiff has failed to present facts showing that they failed to investigate her claims.

With respect to her claim regarding improperly releasing female inmates into DA Pettit's control, Plaintiff asserts that she was released to the DA on May 21, 2007, and other than the release order upon her permanent release ordered by Judge Pozonsky, there was no paperwork. She claims that because Defendants knew that DA Pettit was under investigation, they were deliberately indifferent to her safety by doing so. First, the undersigned notes Plaintiff's contention that it was not "the norm" to release someone into the custody of the DA without a writ or release authority but at the same time she states that, according to Defendant Pelzer, it was a common practice "back then" to do so. (ECF No. 107 at 15.) She notes that the procedure changed in October 2007 and that a new policy was put in place that required all prisoners to have the proper paperwork when moved out of the prison. Id. Despite this inconsistency, Plaintiff has offered nothing to support her position that Defendants knowingly released herself and other female inmates into the control of the DA with deliberate indifference to their safety; *i.e.* that Defendants released these inmates or directed others to release them into the DA's control without the proper paperwork and with knowledge that they would be subjected to the sexual abuse of which she alleges, or that they knowingly implemented such a policy of doing so that created an unreasonable risk that such a violation would occur. Moreover, Plaintiff does not even maintain that such a violation occurred on the one specified instance where she was released without the proper paperwork. Finally, the undersigned notes that in Plaintiff's counsel's improper attempt to raise this claim for the first time in response to Defendant's

Motion for Summary Judgment, she cites to portions of the depositions of Defendants Pelzer and Strawn as well as Captain Hilderbrand but fails to attach the relevant excerpts to her brief. Furthermore, they are not a part of the record and have never become so. This is a clear violation of the Federal Rules and Local Rules of this Court. *See* Fed. R. Civ. P. 56(c)(1)(A); LCvR 46(C). For these reasons, Defendants should be granted summary judgment on this claim.

Finally, the only Eighth Amendment deliberate indifference claim asserted against Defendants McGavitt, Pelzer and Strawn in Plaintiff's *pro se* Amended Complaint is that these Defendants were deliberately indifferent to the health and safety of her and her unborn baby by failing to provide her with adequate medical care.[10] Prison officials are required under the Eighth Amendment to provide basic medical treatment to prisoners. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). In order to establish a violation based on the Eighth Amendment, "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden County Corr. Facillity, 318 F.3d 575, 582 (3d Cir. 2003).

Plaintiff does not specify what medical care she was denied or for what medical needs she was denied it. Her claim is just a blanket assertion that she was denied medical care. Plaintiff's medical records, however, paint a different picture. During her confinement in the WCJ, Plaintiff suffered from many apparent symptoms of urinary tract infections and pelvic inflammatory disease as well as other ailments. According to Plaintiff's medical records, which are even summarized in Plaintiff's brief in opposition to summary judgment, each complaint was

---

[10] Interestingly, while this is the only Eighth Amendment deliberate indifference claim in Plaintiff's complaint against these Defendants, pro bono counsel does not address it in her response in opposition to summary judgment.

responded to with appropriate treatment. *See* ECF Nos. 107 at 13-15; No. 108-3. Indeed, Plaintiff even admits that the treatment Defendant McGavitt "supervised and approved was standard, consisting of STD tests, urine cultures, and treatment with antibiotics." (ECF No. 107 at 12.) Plaintiff's medical records are riddled with evidence of treatment for her numerous infections and pain. Upon review of the record, there is no instance whereby Plaintiff was denied medical treatment and Plaintiff has offered nothing to support her claim. As such, Defendants should be granted summary judgment on this claim to the extent Plaintiff is still pursuing it.

### 5. Claims against Washington County

Plaintiff has sued all Defendants in both their individual and official capacities and she has also sued Washington County. The United States Supreme Court has held that suing a party in his or her official capacity is not a suit against the official but rather is a suit against the official's office. Kentucky v. Graham, 473 U.S. 159, 165 (1985). As such, it is no different from a suit against the entity itself. Graham, 473 U.S. at 166; Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989). In this case, the remaining Defendants are employees of Washington County.

Under section 1983, a local government like Washington County is subject to liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of by the plaintiff. Monell v. Dept. of Soc. Servs. of City of New York, 426 U.S. 658, 694 (1978). The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. Id.

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation. Id. at 690-91. A municipal policy is made when a decision-maker "issues an official proclamation, policy, or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990). A custom or practice, however, may consist of conduct so permanent and well-settled that it has the force of law. Id.

Finally, the plaintiff must show that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of rights." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997). For determining whether a municipality should be held liable under § 1983, "deliberate indifference" is the relevant standard. This is a stringent standard of fault, requiring proof "that the municipal action was taken with deliberate indifference to its known or obvious consequence." Id. at 407 (internal quotations omitted); *see also* City of Canton v. Harris, 489 U.S. 378, 389 (1989). In other words, a plaintiff must demonstrate that a municipality had notice that a constitutional violation could occur and acted with deliberate indifference to this risk. Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).

In this case, Plaintiff alleges that Washington County tolerated a custom or policy of allowing sexual assaults against female inmates at the WCJ; however, Plaintiff has put forth no evidence that she, or any other female inmate at the WCJ, was subjected to sexual assaults by

County employees.[11]  Plaintiff has merely attached excerpts from an FBI investigation into Defendant DA Pettit and asserts that these excerpts show a "story of corruption."  (ECF No. 107 at 16; ECF No. 108-5.)  The excerpts, however, are heavily redacted, and, as presented, do not support Plaintiff's claim that female inmates at the WCJ were subjected to sexual misconduct by DA Pettit or any other County employee.  In fact, it is near impossible to infer any information whatsoever from the documents in their present form.  The record evidence simply does not demonstrate a question of fact as to whether Washington County had a policy or custom to condone the acts of which Plaintiff alleges or fail to investigate or take action when such allegations are made.  As such, Defendant should be granted summary judgment on this claim.

### 6. Defendant Lisa Sutherland

On August 4, 2010, the Court ordered the United States Marshal to serve the Complaint on Defendant Lisa Sutherland.  (ECF No. 39.)  The summons was sent to Defendant Sutherland at the direction of Plaintiff and was returned unexecuted on October 20, 2010, with a notation: "RETURN TO SENDER/FORWARDING ORDER EXPIRED."  (ECF No. 55.)

Under the Federal Rules of Civil Procedure, if a service of summons and complaint is not made upon a defendant within 120 days of filing of the complaint, the court may dismiss the complaint without prejudice as to that defendant.  *See* Fed.R.Civ.P. 4(m).  The complaint in this matter was filed against Defendant Sutherland on June 28, 2010, almost three years ago.  When there has been a failure to timely serve a complaint upon a defendant as contemplated under Federal Rule of Civil Procedure 4(m), a court may dismiss the complaint for failure to comply with Rule 4(m) and for failure to prosecute under Federal Rule of Civil Procedure 41(b).  *See* Liu

---

[11] Notably, Plaintiff does not even specify one instance where she was subjected to such misconduct.  While she conclusively states that she was involved with County officials in sexual acts that were arranged and approved, she fails to identify even one instance when or where this occurred and by whom.

v. Oriental Buffett, 134 F. App'x 544, 546-47 (3d Cir. 2005); Gebhardt v. Borough of Island Heights, 2007 U.S. Dist. LEXIS 90119, 2007 WL 4355465, at *1 (D. N.J. Dec. 7, 2007). Because this matter has been pending against Defendant Sutherland since June of 2010, and because the current address for Defendant Sutherland still remains unknown, the dismissal of this action against her without prejudice for failure to effectuate service is appropriate.

### 7. Defendant John Pettit

As previously noted, Defendant John Pettit, the former District Attorney of Washington County, passed away on October 30, 2010, prior to being served with Plaintiff's complaint. *See* ECF No. 64 at n.1. Plaintiff filed a motion to substitute but because she did not name the proper legal representative as the substitute party her motion was denied. (ECF No. 71.) It has been over two and a half years since the death of this Defendant, more than two years since Plaintiff was made aware of his death, and Plaintiff never filed a proper motion to substitute pursuant to Federal Rule of Civil Procedure 25(a)(1). Therefore, it is recommended that he be dismissed from this action.

## III. CONCLUSION

For the reasons set forth above, it is respectfully recommended that the Motion for Summary Judgment filed by Defendants Pelzer, McGavitt, Strawn and Washington County (ECF No. 103) be granted. It is further recommended that Defendant Sutherland be dismissed from this action for Plaintiff's failure to timely serve her in compliance with Federal Rule of Civil Procedure 4(m) and for Plaintiff's failure to prosecute under Federal Rule of Civil Procedure 4(b). It is also recommended that Defendant Pettit be dismissed from this action because he is deceased and Plaintiff failed to file a proper motion to substitute naming his legal representative within the required time pursuant to Federal Rule of Civil Procedure 25(a)(1).

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated: May 10, 2013

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Counsel of Record
*Via ECF Electronic Mail*